UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

RILEY NEVILLE                                                         Plaintiff

v.                                              Civil Action No. 3:25-cv-227-RGJ

THE SALVATION ARMY NATIONAL                                          Defendants
CORPORATION, ET AL.

* * * * *

**MEMORANDUM OPINION & ORDER**

Defendants Salvation Army USA Southern Territory ("Southern Territory") and Salvation

Army Kentucky and Tennessee Division's ("K/T Division" or "Division") move to dismiss

plaintiff Riley Neville's ("Neville") complaint for insufficient service of process under Rule

12(b)(5) and failure to state a claim under Rule 12(b)(6). [DE 16]. Defendant Salvation Army

National Corporation ("Salvation Army National") moves to dismiss Neville's claims against it

for lack of personal jurisdiction under Rule 12(b)(2) and failure to state a claim. [DE 20]. Neville

responded, [DE 37; DE 38], and Defendants replied [DE 41; DE 42]. Briefing is complete and the

matter is ripe. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN**

**PART** Southern Territory and K/T Division's motion to dismiss, [DE 16], and **GRANTS**

Salvation Army National's motion to dismiss for lack of personal jurisdiction [DE 20].

## I.       BACKGROUND

Neville alleges that in or about 2010, the Salvation Army's Eastern Territory ("Eastern

Territory") hired Joel Collier ("Collier") as a camp leader at a music camp. [DE 1-1 ¶ 10]. During

his employment, Collier sent graphic sexual texts to a minor female camper and was thereafter

terminated. [*Id.* ¶ 12]. In conjunction with his termination, his name was placed on the Eastern

1

Territory's "territorial registry," which contains the names of Salvation Army employees "against whom complaints of sexual abuse of children have been made where there is reasonable suspicion of abuse . . . ." [*Id.* ¶¶ 9, 12]. Pursuant to the Salvation Army's National Policy Statement on Sexual Abuse of Children, the Secretary for Personnel will recommend for rejection any Salvation Army job applicant whose name is on the registry and who applies for employment with children. [*Id.* ¶¶ 9]. Neville maintains that "[e]ach name listed on a territorial registry has a corresponding file that outlines the factual basis for its inclusion. [*Id.* ¶ 13]. The information in the registries is then shared among the four Salvation Army entities—Southern Territory, Central Territory, Western Territory, and Eastern Territory—"to prevent harmful individuals from being transferred between territories." [*Id.* ¶¶ 6, 13].

Neville alleges that around 2015, Collier applied for a position with Southern Territory— another one of the four corporate entities comprising the Salvation Army. [*Id.* ¶¶ 6, 14]. Upon learning that Collier was in the Eastern Territory's registry, Southern Territory removed him from the registry, and, despite knowledge of his prior sexual texts with a minor female, hired him as the Divisional Music Director, a position that tasked him with "leading faith-based music ministry programs, attending music camps, and serving as a leader in Defendant K/T Division's band and chorus." [*Id.* ¶¶ 17–18]. Southern Territory made the decision to remove Collier from the registry even though "[t]he Eastern Territory strongly disagreed with this decision and warned the Southern Territory not to hire Collier." [*Id.* ¶ 15].

In February 2017, Neville, then a minor, attended a music rehearsal led by Collier. [*Id.* ¶ 22]. She maintains that this marked the beginning of years of grooming and sexual abuse by Collier. First, Collier developed a texting relationship with Neville and brought her as a student delegate to a Southern Territory music camp. [*Id.* ¶¶ 24–25]. After the camp, Collier began to send

graphic sexual text messages to Neville, a practice that Collier escalated over the next four years, "to the point that he was telling her what type of sexual acts he expected from her when she turned eighteen." [*Id.* ¶¶ 29–33]. Meanwhile, in or around 2018, Neville's pastor, Sara Orozco ("Orozco") filed a Safe from Harm complaint against Collier for texting Riley when she was a minor. [*Id.* ¶¶ 36]. Similarly, her youth pastor, Candell Rainey ("Rainey") filed a Safe from Harm complaint against Collier "for keeping [Neville] out beyond curfew and for letting her engage in card games with adults in his hotel room when she was a minor and without informing her leaders." [*Id.* ¶ 37]. K/T Division did not follow up on either complaint. [*Id.* ¶¶ 36–37].

Neville alleges that Collier first physically abused her in the summer of 2019, when she was seventeen years old. [*Id.* ¶ 39]. The physical abuse escalated after Neville turned eighteen in March 2020. [*Id.* ¶¶ 41–44]. For instance, on March 27, 2020, the day she turned eighteen, Collier and his brother separately texted her sexually explicit videos of themselves. [*Id.* ¶ 42]. Moreover, Collier "repeatedly initiated sexual contact" with Neville in July 2020 during a weekend retreat at the K/T Division's Burkesville camp location, despite Neville telling him to stop. [*Id.* ¶ 44]. As a result of the continued abuse, Neville twice attempted to take her own life in December 2020 and February 2021. [*Id.* ¶¶ 45, 50]. Neville's parents finally learned of the abuse in April 2021 and reported it to the Salvation Army. [*Id.* ¶ 51]. In August 2021, they learned that Southern Territory had known about Collier's previous sexual texts to a minor and that they had chosen to hire him anyway. [*Id.* ¶ 52].

Neville asserts the following causes of action from these facts: negligence (Count I); negligent hiring, supervision and retention (Count II); fraudulent misrepresentation (Count III); fraudulent omission (Count IV); aiding and abetting human trafficking (Count V);

negligent/intentional infliction of emotional distress (Count VII)[1]; and breach of fiduciary duty (Count VIII). [*Id.* ¶¶ 58–109]. Neville asserts all Counts against Defendants Southern Territory and K/T Division but asserts only Counts I, II, and VIII against Defendant Salvation Army National.

## II.    K/T DIVISION AND SOUTHERN TERRITORY MOTION TO DISMISS

Defendant K/T Division argues, first, that all claims against it must be dismissed because (1) it is not an entity capable of being sued and (2) it was improperly served. [DE 16-1 at 122, 124]. Next, both Southern Territory and K/T Division[2] argue that Neville's claims for negligence and negligent hiring and supervision are time-barred under the applicable statutes of limitations. [*Id.* at 136]. Finally, they argue that the rest of Neville's claims must be dismissed for insufficient pleading. [*Id.* at 132–39].

A. <u>Standard</u>

Federal Rule of Civil Procedure 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard does not "impose

---

[1] Neville labels this cause of action as Count VII even though it is her sixth cause of action. For purposes of consistency, the Court will use the same roman numerals used by Neville.

[2] For purposes of this Motion to Dismiss, the Court will refer to K/T Division and Southern Territory collectively as "Defendants."

a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556. Dismissal under Rule 12(b)(6) is warranted "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him or her to relief." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008).

Because a motion to dismiss challenges the sufficiency of the pleadings, "[i]t is not the function of the court [in ruling on such a motion] to weigh evidence." *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995). Rather, to determine whether the plaintiff set forth a "plausible" claim, the Court "must construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation"; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). In deciding a motion to dismiss, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted). "A complaint will be dismissed . . . if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64).

B. <u>Analysis</u>

      *1. Claims Against K/T Division*

First, K/T Division argues that all claims against it must be dismissed because it is not an entity capable being sued. [DE 16-1 at 122]. It maintains that, as an unincorporated division of Southern Territory, it cannot be sued solely in its own name under Kentucky law. [*Id.* at 123]. K/T Division also argues that the claims against it must be dismissed for improper service because Neville did not serve K/T Division by certified mail with signature or deliver a copy of the summons to an authorized agent of K/T Division. [*Id.* at 124–25]. Neville responds, first, that lack of capacity to be sued is an affirmative defense, and there exists a factual dispute that precludes dismissal at this stage. [DE 38 at 509]. She also disputes K/T Division's claim that Kentucky law prevents an unincorporated association from being sued its own name. [*Id.* at 510]. With respect to K/T Division's argument that service was improper, she argues that there is a presumption under Kentucky law that K/T Division received the summons that was stamped, addressed, and deposited in the mail. [*Id.* at 512]. She also contends that, because this case has been removed, federal law now controls, and the Court should allow additional time for service under Rule 4(m). [*Id.*].

      **a. Capacity to be Sued**

Capacity to be sued "is considered an affirmative defense, not a jurisdictional issue." *Davis v. Lifetime Cap., Inc.*, 560 F. App'x 477, 478 (6th Cir. 2014). Federal Rule of Civil Procedure 9 states that "a pleading need not allege . . . a party's capacity to sue or be sued," and that a party raising capacity to be sued "must do so by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge." Fed. R. Civ. P. 9(a)(1)(A)–(a)(2). A court may grant a motion to dismiss based on an affirmative defense only "if the facts [alleged] conclusively establish the defense as a matter of law." *In re McKenzie*, 716 F.3d 404, 412 (6th Cir. 2013).

Recognizing this, courts in this Circuit regularly grant motions to dismiss based on an entity's lack of capacity to be sued. *See, e.g.*, *Pittman v. Rutherford*, No. 19-36-DLB-CJS, 2019 WL 5558572, at *4 (E.D. Ky. Oct. 28, 2019) ("If a defendant 'lacks the capacity to be sued, Plaintiff fails to state a claim against it upon which relief can be granted,' and claims against that defendant must be dismissed." (quoting *Loper v. Cuyahoga Cty. Children & Family Servs.*, No. 1:18-cv-1598, 2019 WL 1597552, at *3 (N.D. Ohio Apr. 15, 2019))); *Creech v. Nicholasville Police Dep't*, No. 5:25-184-DCR, 2025 WL 3674463, at *6 (E.D. Ky. Dec. 18, 2025). As a result, the Court will consider whether the facts alleged in the complaint conclusively establish that K/T Division is incapable of being sued.

To determine capacity to be sued for an entity that is not an individual or a corporation, the Court looks to "the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3). Under Kentucky law, "an unincorporated association cannot be sued solely in its own name." *Am. Collectors Exch., Inc. v. Kentucky State Democratic Cent. Exec. Comm.*, 566 S.W.2d 759, 761 (Ky. Ct. App. 1978) (holding that a motion to dismiss was appropriate since the defendant was an unincorporated association). However, KRS § 273A.035 clarifies that "[a]n unincorporated *nonprofit* association may sue or be sued in its own name." KRS § 273A.035(1) (emphasis added). The statute defines an "unincorporated nonprofit association" as a "an unincorporated organization consisting of two (2) or more members joined under an agreement that is oral, in a record, or implied from conduct, for one (1) or more common, nonprofit purposes." KRS § 273A.005(11). It further specifies that term does not include any "organization formed under any other statute that governs the organization and operation of any person." *Id.* (11)(c).

The complaint admits that K/T Division is an "unincorporated entity" that serves as "the local representative body" of Southern Territory. [DE 1-1 ¶ 4]. The complaint also states that

"Defendant K/T Division is under the jurisdiction and authority of Defendant Southern Territory and abides by their rules and policies." [*Id.*]. The allegations in the complaint thus establish that K/T Division lacks incorporation and operates under the authority of Southern Territory. Without more, however, it is not plainly evident from these allegations alone that K/T Division is excluded from KRS § 273A.035, which allows an unincorporated nonprofit association to be sued in its own name. In other words, the facts alleged do not conclusively establish that K/T Division falls outside the definition of "unincorporated nonprofit association" provided in the statute. The complaint does not allege facts about how many members make up K/T Division, for example. K/T Division argues that it "falls within KRS 273A.005(11)(c)'s exclusion for entities governed by another statute, here Georgia corporate law" because the complaint alleges that K/T Division operates under the authority of Southern Territory, which operates under Georgia law. [DE 42 at 554]. However, Neville's allegation that Southern Territory has authority over K/T Division does not amount to an allegation that K/T Division was "formed under [another] statute that governs the organization and operation of any person." KRS § 273A.005(11)(c). That is, she does not allege that K/T Division was formed under the Georgia statute for associations. In short, the allegations in the complaint do not show, as a matter of law, that the affirmative defense of lack of capacity applies. *See VCST Int'l B.V. v. BorgWarner Noblesville, LLC*, 142 F.4th 393, 400 (6th Cir. 2025) ("[C]ourts may still grant a motion to dismiss based on an affirmative defense if the complaint's allegations (or any other documents that we may consider at this stage) show as a matter of law that the defense applies.").

In this Court's prior Order denying Neville's motion to remand, the Court rejected Neville's argument that K/T Division was an independent entity for purposes of jurisdiction and explained that "[t]he record makes clear that K/T Division is simply a division of Southern

Territory . . . ." [DE 34 at 464]. The Court's conclusion, however, was based largely on evidence outside the pleadings, such as Southern Territory's employee manual and the Salvation Army Delegation of Authority. [*Id.* at 465]. Unlike a motion to dismiss, when deciding a motion to remand, the Court may "pierce the pleading" and "consider summary judgment evidence." *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 433 (6th Cir. 2012) (quoting *Walker v. Philip Morris USA, Inc.*, 443 F. App'x 946, 952–54 (6th Cir. 2011)). Accordingly, the Court was permitted to "look to material outside the pleadings for the *limited purpose* of determining whether there are 'undisputed facts that negate[d] the claim.'" *Id.* (emphasis added) (quoting *Walker*, 443 F. App'x at 955–56). When deciding a motion to dismiss, however, the Court may only consider matters referred to in the pleadings. *See Armengau v. Cline*, 7 F. App'x 336, 343–44 (6th Cir. 2001). Consequently, the Court may not rely on its prior finding, which was based on evidence only considered for the limited purpose of determining jurisdiction. Moreover, as the Court explained in its Order on the motion to remand, "whether a division is considered an independent entity for purposes of jurisdiction constitutes a separate legal question from whether that entity has the capacity to be sued," which is determined by "the law of the state where the court is located." [*Id.* at 464]. Thus, the Court's conclusion that K/T Division was a division of Southern Territory for purposes of jurisdiction—a conclusion based on evidence outside the pleadings—does not affect the current inquiry, which is based only on the pleadings and only on Kentucky state law.

K/T Division also argues that Neville "does not allege that any 'members' entered into an agreement to form the K/T Division for nonprofit purposes, as required by KRS 273A.005(11)" and that she fails to allege that K/T Division is registered to do business in Kentucky. [DE 42 at 554]. Although true, Neville was not required to plead facts establishing K/T Division's capacity to be sued. *See* Fed. R. Civ. P. 9(a)(1)(A). Only if the undisputed facts conclusively establish that

K/T is *not* capable of being sued should the Court grant the motion to dismiss. *See Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009). The complaint does not affirmatively allege that K/T Division does *not* have members that entered into an agreement for nonprofit purposes, so it does not conclusively establish K/T Division's lack of capacity.

Considering only the allegations in the complaint, it is not clear at this early stage that K/T Division lacks the capacity to be sued under Kentucky law. K/T Division may reassert this argument on summary judgment, once discovery is complete and the Court is able to consider evidence outside the pleadings.

### b. Improper Service

Next, K/T Division argues that the claims against it should be dismissed for ineffective service of process under Rule 12(b)(5). [DE 16-1 at 124]. It maintains that, under Kentucky law, Neville was required to serve the Division either (1) "by registered or certified mail if a return receipt is signed by an appropriate official or agent," or (2) by serving "a partner or managing agent of the partnership or an officer or managing agent of the association, or an agent authorized by appointment or by law to receive service on its behalf." [*Id.* at 125]. K/T Division maintains that there is no evidence that Neville fulfilled one of these methods. In response, Neville argues first that there is a presumption under Kentucky law that K/T Division received the summons when the communication was stamped, addressed, and deposited in the mail. [DE 38 at 512]. Next, she argues that, after removal, the federal rules now control, and the Court has discretion to extend the time to effectuate service. [*Id.*].

Federal Rule of Civil Procedure 12(b)(5) provides that the Court may dismiss an action for "insufficient service of process." Fed. R. Civ. P. 12(b)(5). A plaintiff "bears the burden of perfecting service of process and showing that proper service was made." *Sawyer v. Lexington–*

*Fayette Urb. Cnty. Gov't*, 18 F. App'x 285, 287 (6th Cir. 2001) (citing *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996)). "In considering a motion to dismiss, pursuant to Rule 12(b)(5), [the] Court must accept as true all well pleaded allegations of the complaint, although reference to the record is permissible to determine the alleged insufficiency of service of process." *Paluso v. Perdue*, No. 5:17-CV-00169-TBR, 2019 WL 2479658, at *4 (W.D. Ky. June 12, 2019) (quoting *Thompson v. Kerr*, 555 F. Supp. 1090, 1093 (S.D. Ohio, 1982)). "Although outright dismissal is permitted under Rule[] . . . 12(b)(5), dismissal on [this basis] is not always warranted, and the district court has broad discretion in deciding whether to dismiss a complaint on the ground of improper service." *Est. of Isham v. Richardson*, No. 3:24-CV-142, 2025 WL 2772460, at *2 (S.D. Ohio Sept. 26, 2025), *recons. denied*, No. 3:24-CV-142, 2025 WL 3214348 (S.D. Ohio Nov. 18, 2025) (citation modified) (citing *Kalasho v. Republic of Iraq*, 102 F. App'x 27, 28 (6th Cir. 2004). Generally, "[d]efects in the service of process . . . require granting leave to attempt valid service rather than dismissal." *Tran v. Mich. Dep't of Hum. Servs.*, No. 07-CV-13232, 2008 WL 2513862, at *3 (E.D. Mich. June 19, 2008) (citing *Frederick v. Hydro-Aluminum S.A.*, 153 F.R.D. 120, 123 (E.D. Mich. 1994)); *Smith v. Kentucky Fried Chicken*, No. CIV.A. 06-426-JBC, 2007 WL 162831, at *3 (E.D. Ky. Jan. 18, 2007) (explaining that, while the court may dismiss a case for insufficient service, "the better practice is to quash insufficient service of process unless it is clear that the plaintiff cannot effect proper service").

In cases that are removed from state court, "[f]ailure to comply with state service-of-process rules can result in the dismissal of removed cases." *Smith v. Parks*, No. CIV.A. 5:14-260-KKC, 2015 WL 770337, at *1 (E.D. Ky. Feb. 23, 2015) (citing *Bates v. Harp*, 573 F.2d 930, 933–34 (6th Cir. 1978)). "In determining the validity of service in the state court prior to removal, a federal court must apply the law of the state under which the service was made." 4A Charles Alan

Wright & Arthur R. Miller, Federal Practice and Procedure § 1082 (2d ed. 1987).  After removal, federal law controls, and defects in service that occurred prior to removal can be cured in accordance with the Federal Rules of Civil Procedure. Fed. R. Civ. P. 81(c)(1) ("These rules apply to a civil action after it is removed from a state court."); 28 U.S.C. § 1448 ("In all cases removed from any State court to any district court of the United States in which . . . the service has not been perfected prior to removal, . . . such process or service may be completed or new process issued in the same manner as in cases originally filed in such district court."). Accordingly, the Court first considers whether service was defective under Kentucky law, and if so, whether Neville may nonetheless perfect service under the Federal Rules.

Neville attempted to serve K/T Division via certified mail at its Louisville address on the same day she filed the complaint. [DE 1-1 at 68]. "Kentucky law provides that a defendant can be served (1) through personal delivery, to the defendant or his agent, by a person authorized to deliver service; or (2) by registered or certified mail, return receipt requested." *Soares v. Boyd*, No. CV 7:17-150-KKC, 2019 WL 1119353, at *2 (E.D. Ky. Mar. 11, 2019) (citing Ky. R. Civ. P. 4.01(1)(b), 4.04(2)). If a plaintiff serves a defendant through certified mail, delivery is accomplished "only if the defendant, or his agent, personally signs for the letter when it arrives." *Id*; *Fleet v. Commonwealth of Kentucky Cabinet for Health & Fam. Servs.*, No. 3:15-CV-00476-JHM, 2016 WL 1241540, at *6 (W.D. Ky. Mar. 28, 2016). Neville provides no evidence that an authorized agent signed for the summons. Even so, she maintains that, under Kentucky law, there is a presumption that the properly stamped and addressed summons was delivered. [DE 38 at 512]. She cites to *Haven Point Enters., Inc. v. United Kentucky Bank, Inc.*, in which the Kentucky Supreme Court stated that "[t]here is always a presumption that a communication that was properly stamped, addressed and deposited in the mail was received by the addressee." 690 S.W.2d 393,

395 (Ky. 1985). However, a defendant may overcome this presumption by showing that it never received the letter. *See id.*; *TKT-Nectir Glob. Staffing, LLC v. Managed Staffing, Inc.*, No. 3:18-CV-099-CHB, 2018 WL 5636163, at *1 (W.D. Ky. Oct. 31, 2018).  K/T Division has rebutted this presumption by providing evidence that the summons was never delivered by USPS. [DE 42-2]. Neville provides no evidence that any other method of service was attempted, so service was ineffective under Kentucky law.

Because this action has been removed, the Court looks to the Federal Rules of Civil Procedure to cure the defects in service. *See* 28 U.S.C. § 1448; Fed. R. Civ. P. 81(c)(1). For cases removed to federal court, Rule 4(m) permits service within 90 days after the date of removal. *See Cowen v. Am. Med. Sys., Inc.*, 411 F.Supp.2d 717, 721 (E.D. Mich. 2006). This case was removed on April 21, 2025, and no other service of process has been effectuated. Neville has therefore missed the 90-day period to perfect service. However, Rule 4(m) permits the Court to extend the time to effect service. Rule 4(m) provides, in relevant part:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). "Courts have held that the first sentence of Rule 4(m) allows a district court to extend the time to effectuate service, even absent a showing of good cause." *Smith v. Parks*, 2015 WL 770337, at *3 (citing *Stewart v. Tenn. Valley Auth.*, 238 F.3d 424, 2000 WL 1785749, at *1 (6th Cir. Nov. 21, 2000) (unpublished table decision)); *Kinney v. Lexington–Fayette Urban Cnty. Gov't*, No. 5:12–360–KKC, 2013 WL 3973172, at *2 (E.D. Ky. Aug. 1, 2013) ("Having found no good cause shown, the Court must still determine if it should exercise its discretion to expand the time for service."); *Boulger v. Woods*, 306 F. Supp. 3d 985, 993 (S.D. Ohio 2018),

*aff'd*, 917 F.3d 471 (6th Cir. 2019) ("A 'plain reading' of the Rule 'shows that a district court generally possesses the discretion to dismiss a complaint or to allow service to be perfected within a specified time, regardless of the absence of good cause, whenever a plaintiff fails to perfect service within [90] days after filing a complaint.'" (quoting *Greene v. Venatter*, No. 2:13–CV–00345, 2014 WL 559154, at *2 (S.D. Ohio Feb. 11, 2014))).

Although Neville has not shown good cause for failing to perfect service, the Court may still, in its discretion, order that service be made within a specified time. *See TKT-Nectir*, 2018 WL 5636163, at *3 ("[T]he Court must first determine whether there is good cause for Plaintiffs' failure to timely execute service. If not, the Court must determine in its discretion whether to dismiss the action or allow Plaintiffs additional time." (quoting *Bradford v. Bracken Cnty.*, 767 F. Supp. 2d 740, 753 (E.D. Ky. 2011))). Courts consider several factors in deciding whether to extend the time for proper service:

> (1) whether a significant extension of time was required; (2) whether an extension of time would prejudice the defendant other than the inherent 'prejudice' in having to defend the suit; (3) whether the defendant had actual notice of the lawsuit; (4) whether a dismissal without prejudice would substantially prejudice the plaintiff . . . and (5) whether the plaintiff had made any good faith efforts at effecting proper service of process.

*Kinney*, 2013 WL 3973172, at *2. Here, the factors weigh in favor of granting Neville additional time to effectuate proper service. K/T Division does not suggest that any prejudice to it would result from an extension of time, and it is clear that K/T Division had actual notice of the lawsuit. Moreover, Neville made a good faith effort to effect proper service under Kentucky law by sending the summons by certified mail. [DE 1-1 at 68]. K/T Division argues that the Court should decline to exercise its discretion to grant additional time because Neville has made no attempt to perfect service. [DE 42 at 555]. However, Neville was awaiting this Court's decision on her motion to

14

remand, so even if she knew the summons had not been delivered, her delay in perfecting service was excusable.

Accordingly, the Court will grant Neville a brief extension of time to properly effectuate service now. *See Kinney*, 2013 WL 3973172, at *2 (granting plaintiffs a 45-day extension when they had made a good-faith attempt to serve defendants and no prejudice would result to defendants); *Smith v. Parks*, 2015 WL 770337, at *3 (granting plaintiff a 30-day extension). If Neville does not properly serve K/T Division within the time allotted by the Court, the Court will dismiss without prejudice the claims against K/T Division in accordance with Fed. R. Civ. P. 4(m).

### 2. *Statute of Limitations (Counts I –II)*

Next, both K/T Division and Southern Territory argue that Neville's claims for negligence and negligent hiring, supervision, and retention are time-barred. First, they maintain that all claims based on alleged incidents that occurred after Neville turned eighteen are subject to the one-year statute of limitations for personal injuries in KRS § 413.140(1)(a), and her suit was filed more than one year after those incidents. [DE 16-1 at 126]. Next, they argue that claims based on incidents that occurred before Neville turned eighteen should be excluded from KRS § 413.249's ten-year limitations period for childhood sexual abuse because Neville did not abide by the procedural requirements sets forth in KRS § 413.249(4). [*Id.* at 130]. In response, Neville argues that the five-year limitations period from KRS § 413.2485 applies to her negligence claims arising from incidents that occurred after she turned eighteen, so those claims are not time-barred. [DE 38 at 516]. Next, she argues that incidents that occurred before she turned eighteen are not excluded from KRS § 413.249's ten-year limitations period simply because she failed to comply with KRS § 413.249(4)'s procedural requirements. [DE 38 at 513].

Dismissal of a claim under Rule 12(b)(6) on grounds that it is barred by a limitations period is warranted only if "the allegations in the complaint affirmatively show that the claim is time-barred." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). In other words, it must be "apparent from the face of the complaint that the time limit for bringing the claim[s] has passed." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 521 (6th Cir. 2008) (alteration in original) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)).

### a.   Claims Based on Incidents After Neville's Eighteenth Birthday

Neville turned eighteen on March 27, 2020, after which—she alleges—Collier texted her sexually explicit videos, assaulted her at the Burkesville camp, and subjected her to non-consensual intercourse. [DE 1-1 ¶¶ 42, 44, 46–47]. She also alleges that her parents did not make complaints until April 2021, after Neville had turned eighteen. [*Id.* ¶ 51]. With respect to these incidents, the Defendants and Neville disagree only on which statute of limitations applies: the five-year limitations period of KRS § 413.2485 or the one-year limitations period of KRS § 413.140(1)(a). Because Neville's complaint was filed on March 26, 2025, claims based on the incidents that occurred after she turned eighteen would clearly be timely if subject to the five-year limitations period. By contrast, they would clearly be time-barred if subject to the one-year statute of limitations, given that the complaint was filed approximately four years after the last act alleged by Neville. Accordingly, the Court's finding as to which statute of limitations applies to these allegations is dispositive.

The Defendants argue that KRS § 413.2485—the Kentucky statute of limitations relating to sexual offense claims—applies only to claims brought against the individual who directly perpetrated the sexual offense, not to third parties. [DE 16-1 at 127–28]. They argue that claims brought against third parties like K/T Division and Southern Territory are instead subject to KRS

16

§ 413.140(1)(a)'s general one-year limitations period for personal injury claims. Neville responds that the language of the sexual offense statute is not limited to claims against a perpetrator but rather applies broadly to injuries suffered "as a result of" a sexual offense. [DE 38 at 516].

KRS § 413.2485 was enacted in 2017, and there is not yet any binding precedent as to whether it applies to third parties as well as perpetrators. Though several courts have discussed the applicability of the KRS § 413.2485 five-year limitations period to various claims, none have decided whether it applies to claims against third parties. *See Alexander v. Univ. of Kentucky*, No. 5:24-CV-107-KKC, 2025 WL 540441, at *6 (E.D. Ky. Feb. 18, 2025) (addressing only the applicability of the statute to claims against the direct perpetrator); *Smith v. Tyler*, 529 F. Supp. 3d 708, 715 (W.D. Ky. 2021) (finding that the five-year statute of limitations did not apply in the context of § 1983 claims, which are subject to the one-year statute of limitations under Sixth Circuit precedent); *Batrice v. Arar*, 2024 Ky. Cir. LEXIS 333, *15 (Jeff. Cir. Ct. Apr. 17, 2024) (analyzing only whether the General Assembly intended for KRS § 413.2485 to have a retroactive effect).

When applying substantive state law on an issue of first impression, a federal court must decide the unsettled issues "as a Kentucky court would decide them." *Kelly v. McFarland*, 243 F. Supp. 2d 715, 717 (E.D. Ky. 2001) (citing *Overstreet v. Norden Laboratories, Inc.*, 669 F.2d 1286, 1290 (6th Cir. 1982)). The Kentucky Supreme Court prioritizes "ascertain[ing] and giv[ing] effect to the intent of the legislature." *Hale v. Combs*, 30 S.W.3d 146, 151 (Ky. 2000). "To determine legislative intent, a court must refer to 'the words used in enacting the statute rather than surmising what may have been intended but was not expressed.'" *Com. v. Allen*, 980 S.W.2d 278, 280 (Ky. 1998) (citing *Flying J Travel Plaza v. Commonwealth, Ky.*, 928 S.W.2d 344, 347 (1996)). Likewise, a court "may not interpret a statute at variance with its stated language." *Id.* (quoting

*Layne v. Newberg*, 841 S.W.2d 181, 183 (1992)). "The most commonly stated rule in statutory interpretation is that the 'plain meaning' of the statute controls." *Wheeler & Clevenger Oil Co. v. Washburn*, 127 S.W.3d 609, 614 (Ky. 2004). To that end, "an act is to be read as a whole, *i.e.*, any language in the act is to be read in light of the whole act, not just a portion of it." *Popplewell's Alligator Dock No. 1, Inc. v. Revenue Cabinet*, 133 S.W.3d 456, 465 (Ky. 2004) (citation modified). And "[w]hat is not said may be of as much significance as what is said." *Davis v. Commonwealth Life Ins. Co.*, 284 S.W.2d 809, 810 (Ky. 1955).

The Court looks first to the plain text of the statute. KRS § 413.2485 is titled "[a]ction relating to injury to or illness of an adult as a result of a sexual offense." The statute then provides, in relevant part:

> (2) A civil action for recovery of damages for an injury or illness suffered as a result of an act or series of acts against a person eighteen (18) years old or older that meets the criteria of KRS 510.040, 510.050, 510.060, 510.070, 510.080, 510.090, 510.110, 510.120, 510.130, 510.140, 510.150, 529.100 where the offense involves commercial sexual activity, 529.110 where the offense involves commercial sexual activity, 530.020, 531.090, or 531.100, shall be brought before whichever of the following periods last expires:
>
> > (a) Within five (5) years of the act or the last of a series of acts by the same perpetrator;
> >
> > (b) Within five (5) years of the date the victim knew, or should have known, of the act; [or]
> >
> > (c) Within five (5) years upon knowledge or identity of the perpetrator
>
> . . . .

KRS § 413.2485(2). The text thus specifies that the five-year limitations period applies only to actions for injuries suffered as a result of an act that falls within one of the enumerated sexual offenses. *Id.*; *see also Smith v. Tyler*, 529 F. Supp. 3d 708, 715 (W.D. Ky. 2021) ("The statute provides a five-year limitations period for injuries 'suffered as a result of an act or series of acts

against a person eighteen (18) years old or older that meets the criteria of [Kentucky's sexual offense statutes].'"). The text does not directly state that it applies only to claims against perpetrators. Moreover, it states that the limitations period applies to any actions for injuries suffered "as a result of" an act that meets the criteria for one of Kentucky's criminal sexual offenses. In other words, the limitations period applies to any injuries suffered *as a result of* a sexual offense, not just injuries directly from the perpetrator. However, the statute also makes clear that the underlying conduct must fall within one of enumerated offenses, each of which punishes an offender for conduct he directly engaged in.[3] It also ties the commencement of the running of the limitations period to acts of the perpetrator himself—either the last act by the "same perpetrator," the time at which the victim knew of the act, or the time at which the victim learned the identity of the perpetrator. KRS § 413.2485(2). These provisions seem to conflict—while one speaks broadly of injuries suffered "as a result" of an enumerated offense, the others speak of acts done by the perpetrator. The Court cannot ascertain the intent of the legislature purely from the text of the statute and therefore must look to other sources to determine its meaning. *See Pearce v. Univ. of Louisville, by & through its Bd. of Trs.*, 448 S.W.3d 746, 749 (Ky. 2014) ("[I]f the statutory language is ambiguous, we will look to other sources to ascertain the legislature's meaning, such as legislative history and public policy considerations.").

Another Kentucky statute—KRS § 413.249—is helpful in determining the legislature's intent with respect to KRS § 413.2485. In 2017, the Kentucky General Assembly both enacted KRS § 413.2485 and amended KRS § 413.249—the statute for childhood sexual abuse—to extend

---

[3] The following offenses are enumerated: Rape (KRS § 510.040; KRS § 510.050; KRS § 510.060); Sodomy (KRS § 510.070; KRS § 510.080; KRS § 510.090); Sexual abuse (KRS § 510.110; KRS § 510.120; KRS § 510.130); Sexual misconduct (KRS § 510.140); Indecent exposure in the second degree (KRS § 510.150); Human trafficking, where the offense involves commercial sexual activity (KRS § 529.100); Promoting human trafficking, where the offense involves commercial sexual activity (KRS § 529.110); Incest (KRS § 530.020); Voyeurism (KRS § 531.090); and Video voyeurism (KRS § 531.100). *See* KRS § 413.2485(2).

the limitations period to ten years. S.B. 224, 2017 Reg. Sess. (Ky. 2017). Four years later, in 2021,

the legislature again amended KRS § 413.249 to add language explicitly applying the ten-year

limitations period to non-perpetrator third parties. H.B. 472, 2021 Reg. Sess. (Ky. 2021); *see also*

KRS § 413.249(3)(b), (5). The new language added to KRS § 413.249 in 2021 stated, in relevant

part:

> (3) The time period set forth in subsection (2) of this section shall apply to a civil
> action for recovery of damages for injury or illness against:
>
> > (a) A person alleged to have committed the act of childhood sexual assault
> > or abuse; or
> >
> > *(b) An entity that owed a duty of care to the plaintiff, where a wrongful or
> > negligent act by an employee, officer, director, official, volunteer,
> > representative, or agent of the entity was a legal cause of the childhood
> > sexual assault or abuse that resulted in the injury to the plaintiff.*
>
> . . .
>
> (5) *A victim of childhood sexual assault or abuse shall not have a cause of action
> against a third party, unless the third party failed to act as a reasonable person or
> entity in complying with their duties to the victim.*

KRS § 413.249(3)(b), (5) (emphasis added). Notably, before the legislature amended KRS

§ 413.249 in 2021 to apply to non-perpetrator third parties, the statute enumerated the same list of

offenses currently enumerated in KRS § 413.2485. *See* S.B. 224, 2017 Reg. Sess. (Ky. 2017); KRS

§ 413.2485(2). In other words, the pre-2021 language of KRS § 413.249 largely mirrored the

language of KRS § 413.2485. Before 2021, KRS § 413.249, like KRS § 413.2485, had no provision

that explicitly applied its extended limitations period to third parties, and it specified that the act

that caused the injury must meet the criteria for one of the enumerated offenses.[4]

---

[4] Specifically, the statute stated that:

> (a) "Childhood sexual assault" means an act or series of acts against a person less than
> eighteen (18) years old and which meets the criteria defining a felony in *KRS 510.040,
> 510.050, 510.060, 510.070, 510.080, 510.090, 510.110, 529.100* where the offense

20

Applying the pre-2021, childhood abuse statute—KRS § 413.249—courts regularly concluded that the extended ten-year statute of limitations applied only to perpetrators, not to third parties. *See Doe v. Logan*, 602 S.W.3d 177, 188 (Ky. Ct. App. 2020) ("The extended ten-year limitations period under KRS 413.249 does not apply to claims against non-perpetrator third parties."); *Roman Cath. Bishop of Louisville v. Burden*, 168 S.W.3d 414, 417–18 (Ky. Ct. App. 2004) (agreeing with the Jeffersons Circuit Court's reading of KRS § 413.249—that it "appears to be directed at perpetrators and not third parties since it sets forth sexual offenses which a third party . . . would be incapable of committing"); *Knaus v. Great Crossings Baptist Church, Inc.*, No. 2009-CA-000141-MR, 2010 WL 476046, at *2 (Ky. Ct. App. Feb. 12, 2010) (unpublished) (finding KRS § 413.249 inapplicable, "as our [c]ourts have previously held that this statute does not apply to claims against third parties, but only to the perpetrator him or herself"). This Court, citing *Burden* and *Knaus*, likewise found that KRS § 413.249's ten-year statute of limitations did not apply to non-perpetrators and therefore applied the one-year statute of limitations for personal injuries to the negligence and negligent hiring claims against third parties. *See B.L. v. Schuhmann*, 380 F. Supp. 3d 614, 639, 642 (W.D. Ky. 2019).

KRS § 413.2485 likewise includes a list of enumerated offenses that are directed to the perpetrator himself, not to third parties who negligently failed to enforce policies or negligently

---

involves commercial sexual activity, 529.110 where the offense involves commercial sexual activity, *530.020, 530.064, 531.310, or 531.320*. No prior criminal prosecution or conviction of the civil defendant for the act or series of acts shall be required to bring a civil action for redress of childhood sexual assault;

(b) "Childhood sexual abuse" means an act or series of acts against a person less than eighteen (18) years old and which meets the criteria defining a misdemeanor *in KRS 510.120, KRS 510.130, KRS 510.140, or KRS 510.150*. No prior criminal prosecution or conviction of the civil defendant for the act or series of acts shall be required to bring a civil action for redress of childhood sexual abuse[.]

S.B. 224, 2017 Reg. Sess. (Ky. 2017) (emphasis added).

employed a perpetrator. *See* KRS § 413.2485(2). This list of offenses indicates that the General Assembly intended the "act" that gives rise to the civil action to be the act of the perpetrator, not the negligence of a third party. Moreover, in 2021, the Kentucky General Assembly chose to amend KRS § 413.249 to explicitly apply the ten-year limitations period to third parties who breached a duty to the plaintiff. Knowing that courts had interpreted the parallel language of KRS § 413.249 to apply only to direct perpetrators, the legislature nonetheless chose not to similarly amend KRS § 413.2485. In other words, the legislature was aware that courts would apply the five-year limitations period only to claims brought against perpetrators and chose not to preclude that interpretation. From this, the Court concludes that the legislature did not intend KRS § 413.2485 to apply to third parties.

Neville argues that the five-year limitations period should nonetheless apply to her negligence claims because included in the enumerated offenses is human trafficking. [DE 38 at 517]. She argues that the human trafficking statute does not require that the defendant directly carry out an assault to be found liable, and that her complaint states a claim for aiding and abetting human trafficking. [*Id.*]. While it is true that KRS § 529.110 punishes an individual for "promoting human trafficking," and KRS § 529.100 does not "require that the defendant directly carr[ied] out [a] sexual assault," [DE 38 at 516 (alteration in original)], those statutes still only apply to those who "intentionally" engage in some act. Specifically, KRS § 529.110 requires the person to either intentionally "[b]enefit[] financially . . . from *knowing* participation in human trafficking" or intentionally "[r]ecruit, entice[], harbor[], transport[], provide[], or obtain[] . . . another person, *knowing* that the person will be subject to human trafficking." KRS § 529.110(1)(a)–(b). KRS § 529.100 requires the person to "intentionally subject[]" a person to engage in forced labor or

commercial sexual activity. KRS § 529.100(1)(a)–(b). Human trafficking therefore requires some intentional act; far from the negligence claims at issue here.

The Court therefore finds that the one-year limitations for negligence claims, as opposed to the five-year limitations period for sexual offenses, applies to Counts I and II of Neville's complaint. Consequently, to the extent that Counts I and II of the complaint rely on incidents that occurred *after* Neville turned eighteen, they are time-barred. Neville also alleges facts that occurred before she turned eighteen, however, so the Court will not dismiss these claims outright unless they are also time-barred under the childhood sexual abuse statute.

### b. Claims Based on Incidents Before Neville's Eighteenth Birthday

Southern Territory and K/T Division next argue that Neville's claims based on incidents that occurred before she turned eighteen are time-barred because she failed to comply with KRS § 413.249's prerequisites to filing suit. [DE 16-1 at 130]. Specifically, they contend that Neville's failure to file her complaint under seal pursuant to KRS § 413.249(4) should preclude her from taking advantage of KRS § 413.249(2)'s ten-year limitations period for childhood abuse. [*Id.*]. In response, Neville points out that KRS § 413.249(4) states no penalty for noncompliance, and that this procedural requirement should not bar her claims. [DE 38 at 515].

Without any precedent directly addressing whether the requirement of KRS § 413.249(4) serves as a prerequisite to the ten-year limitations period, the Court once again begins with the plain text of the statute. KRS § 413.249—the statute establishing the limitations period for actions relating to childhood sexual abuse—states that such actions "shall be brought within ten (10) years after the victim attains the age of eighteen (18) years." KRS § 413.249(2). The statute separately states that the complaint "shall be accompanied by a motion to seal the record and the complaint shall immediately be sealed by the clerk of the court." KRS § 413.249(4). The statute does not

attach the ten-year limitations period to the sealing requirement or otherwise suggest that the limitations period is contingent on fulfilling a procedural prerequisite. Notably, the statute elsewhere uses limiting language, clarifying that the limitations period only applies in certain contexts. For instance, subsection (3) states that "the time period set forth in subsection (2) of this section shall apply to a civil action for recovery of damages for injury or illness against" a person who committed the offense or an entity who owed a duty of care to the plaintiff. KRS § 413.249(3). Subsection (4), by contrast, simply states that "[t]he complaint shall be accompanied by a motion to seal the record[.]" Without language suggesting that the ten-year limitations period is contingent on the sealing requirement, the Court will not infer such a meaning. If the legislature had wanted the limitations period to be conditional on this procedural requirement, it could have done so explicitly, as it did in subsection (3). *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here [the legislature] includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion.").

Defendants characterize KRS § 413.249(4) as a "predicate or precondition" to applying the ten-year limitations period but offer no textual support for that characterization. Moreover, in amending KRS § 413.249 to extend the limitations period, the General Assembly explained that KRS § 413.249(2) "is a remedial statute which is to be given the most liberal interpretation to provide remedies for victims of childhood sexual assault or abuse." KRS § 413.249(7). The legislature therefore intended the limitations period to be liberally construed so as to provide relief to victims of abuse. Reading a prerequisite into the statute would go against that express intent, as well as the plain text of the statute. The Court therefore rejects Defendants' argument and finds

that the ten-year limitations period applies to Neville's negligence claims against K/T Division and Southern Territory.

Accordingly, to the extent that Counts I and II of the complaint are based on alleged incidents that occurred before Neville turned eighteen, they are not time-barred. The Court therefore grants Defendants' motion to dismiss Counts I and II only to the extent that those claims rely on incidents that occurred before Neville turned eighteen.

### 3. *Insufficient Pleading (Counts III–VIII)*

#### a. **Fraudulent Misrepresentation and Omission (Counts III–IV)**

Southern Territory argues that Neville fails to sufficiently plead both fraudulent misrepresentation and fraudulent omission.[5] [DE 16-1 at 135]. Specifically, Southern Territory contends that Neville fails to point to "specific affirmative acts or misrepresentations, including the time, place, and content of any allegedly false representations," so the fraudulent misrepresentation claim must be dismissed. [*Id.* at 136]. It further contends that the fraudulent omission claim fails because Southern Territory had no "duty to disclose." [*Id.* at 137]. Neville responds that she has met the pleading requirements for both fraudulent misrepresentation and fraudulent omission.

##### i.   Fraudulent Misrepresentation (Count III)

To state a claim for fraudulent misrepresentation, a plaintiff must allege that the defendant: (1) made a material representation; (2) that was false; (3) that the defendant knew to be false or made with reckless disregard of its truthfulness; (4) that was intended to cause the plaintiff to act; (5) that the plaintiff acted in reliance upon; and (6) that caused the plaintiff to suffer an injury.

---

[5] Only Southern Territory argues that Neville has failed to state a claim. [DE 16-1 at 136]. As a result, the Court will only discuss whether the complaint states a claim for fraudulent misrepresentation and omission with respect to Southern Territory.

*Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011). Moreover, Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead fraud allegations with particularity. Fed. R. Civ. P. 9(b). To comply with Rule 9(b), a plaintiff, at a minimum, must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)). Such allegations must "be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Coffey*, 2 F.3d at 162.

Here, Neville alleges that Southern Territory "represented to [Neville] that Collier was safe to work with children," and that Southern Territory knew this representation was false because it had knowledge that Collier's name was on the Eastern Territory registry for sending sexually explicit texts to a minor. [DE 101 ¶¶ 81, 84]. These allegations fail to indicate the "time, place, and content" of the misrepresentation made by Southern Territory and therefore do not meet the heightened pleading requirements of Rule 9(b). *See Bledsoe*, 342 F.3d at 643; *Schuhmann*, 380 F. Supp. 3d at 652–53 (finding that plaintiffs did not adequately plead fraudulent concealment when their allegations failed to "point to Defendants' specific affirmative acts or misrepresentations, including the time, place, and content of any allegedly false representations"); *Est. of Abdullah ex rel. Carswell v. Arena*, 601 F. App'x 389, 394 (6th Cir. 2015) (finding that plaintiff did not adequately plead fraudulent concealment when the complaint failed to allege "any fraudulent statement" by the defendant). Without alleging any specific statement made by Southern Territory or when that statement was made, Neville has failed to state a claim for fraudulent misrepresentation. Accordingly, Count III will be dismissed as to Southern Territory.

ii.   <u>Fraudulent Omission (Count IV)</u>

Fraudulent omission, unlike misrepresentation, is "grounded in a duty to disclose."

*Giddings*, 348 S.W.3d at 747. To state a claim for fraudulent omission, a plaintiff must allege that:

"(1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to

disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to

act; and (4) the plaintiff suffered actual damages as a consequence." *Id.* Kentucky recognizes a

duty to disclose in four circumstances: (1) a duty arising from a confidential or fiduciary

relationship; (2) a duty provided by statute; (3) a duty arising when a defendant "has partially

disclosed material facts to the plaintiff but created the impression of full disclosure"; and (4)

"where one party to a contract has superior knowledge and is relied upon to disclose [the] same."

*Id.* at 747–48 (first quoting *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636,

641 (Ky. Ct. App. 2003); and then quoting *Smith v. Gen. Motors Corp.*, 979 S.W.2d 127, 129 (Ky.

Ct. App. 1998)). Rule 9(b)'s pleading requirements are relaxed for fraudulent omission because "a

plaintiff in a fraud by omission suit will not be able to specify the time, place, and specific content

of an omission as precisely as would a plaintiff in a false representation claim." *Schuhmann*, 380

F. Supp. 3d at 651 (quoting *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1098–99 (N.D. Cal.

2007)).

The complaint alleges that (1) the Defendants had a duty to disclose that Collier was on the

registry for sending sexually explicit texts to a minor; (2) the Defendants failed to disclose that

fact and concealed it by removing Collier's name from the registry; (3) their failure to disclose

induced Neville to trust Collier and caused her to be alone with him; and (4) as a result, Neville

suffered physical injuries and emotional distress. [DE 1-1 ¶¶ 89–92]. Contrary to Southern

Territory's argument that Neville fails to allege a duty to disclose, the complaint alleges that

Defendants had a duty to disclose pursuant to "mandatory reporting laws that are designed to protect the safety of minors . . . ." [DE 1-1 at 60]. The fact that the complaint does not name the statute or provide the statute number does not make this a "legal conclusion" such that the Court must entirely discount it. *See Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987) ("[We] need not accept as true legal conclusions[.]"). Neville has pled the existence of a duty to disclose Collier's status as an offender, Defendants' omission of that fact, Neville's reliance on that omission, and the injury suffered as a result of the omission. She therefore adequately alleges the elements of fraudulent omission and states a plausible claim for relief. As a result, the Court denies Southern Territory's motion to dismiss as to Count IV.

### b. Aiding and Abetting Human Trafficking (Count V)

Southern Territory argues that the complaint fails to state a plausible claim for aiding and abetting human trafficking.[6] [DE 16-1 at 138]. Specifically, Southern Territory maintains that Neville fails to adequately allege that Collier subjected her to commercial sexual activity because she does not allege that anything of value was given or promised to her in exchange for performing a sex act. [*Id.* at 138–39]. Southern Territory further argues that even if Neville adequately alleges that Collier engaged in human trafficking, she does not allege that Southern Territory took an affirmative act to assist Collier in his misconduct. [*Id.* at 139]. Neville argues that the complaint alleges that Collier "forced [Neville]" to engage in sex acts "with the promise of his continued favor and special privilege at music camp," and therefore that something of value was promised to her. [DE 38 at 523]. She also argues that the complaint plausibly alleges that Southern Territory aided and abetted Collier by providing "substantial assistance and/or encouragement to Collier's

---

[6] Only Southern Territory argues that Neville has failed to state a claim with respect to Count V. [DE 16-1 at 138]. As a result, the Court will only discuss whether the complaint states a claim for aiding and abetting human trafficking with respect to Southern Territory.

trafficking by intentionally concealing Collier's history as a sexual offender who produced and provided obscene material to a minor female and then knowingly placing him in a position of authority and influence over [Neville]." [*Id.* at 524]. Considering the parties' argument, the Court must determine whether the complaint plausibly alleges both (1) human trafficking by Collier, and (2) aiding and abetting human trafficking by Southern Territory.

A person is guilty of human trafficking if he intentionally subjects a person to engage in "[c]ommercial sexual activity through the use of force, fraud, or coercion, except that if the person is under the age of eighteen (18), the commercial sexual activity need not involve force, fraud, or coercion." KRS § 529.100(1)(b). "Commercial sexual activity" is defined as either "any sex act, for which anything of value is given to, promised to, or received by any person," "[p]articipation in the production of obscene material as set out in KRS Chapter 531, or "[e]ngaging in a sexually explicit performance." KRS § 529.010(3).

The complaint alleges that Collier forced Neville, a minor, to "engage in a sex act with the promise of his continued favor and special privilege at music camp and when he forced Riley to send him sexually explicit photos." [DE 1-1 ¶ 95]. Southern Territory argues that this factual allegation does not constitute "commercial sexual activity" because "a promise to treat someone favorably" is not considered something "of value" as required by the statute. [DE 16-1 at 138]. However, the "the statutory definition of 'commercial sexual activity' encompasses far more than mere commerce." *Bray v. Commonwealth*, No. 2024-SC-0015-MR, 2025 WL 2999316, at *3 (Ky. Oct. 23, 2025). KRS 529.010(3)(b) requires only participation in the production of obscene material, for instance. There is therefore no need for Neville to allege that Collier engaged in a traditional commercial transaction. *See id.* ("[T]he plain statutory language simply does not contain an explicit requirement of a commercial transaction[.]"). The complaint alleges that Collier

29

forced Neville to send him sexually explicit photos. It therefore adequately pleads that Collier intentionally subjected a person—Neville—to engage in the production of obscene material, which constitutes "commercial sexual activity." Southern Territory apparently concedes this point in its reply. [DE 42 at 565].

Having found that Neville plausibly alleges the elements of human trafficking by Collier, the Court next considers whether she plausibly alleges that Southern Territory aided and abetted human trafficking. "In civil law, aiding and abetting . . . impose[s] joint tortfeasor liability for tortious harm to another." *Cowing v. Commare*, 499 S.W.3d 291, 294 (Ky. Ct. App. 2016), as modified (Sept. 9, 2016). Kentucky courts follow "the Restatement (Second) of Torts, § 876 in defining the elements of aiding and abetting." *Insight Kentucky Partners II, L.P. v. Preferred Auto. Servs., Inc.*, 514 S.W.3d 537, 546 (Ky. Ct. App. 2016). Under the Restatement, a person is subject to liability for harm resulting to a third person from the tortious conduct of another if he:

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979). The Kentucky Court of Appeals has stated that, to prevail on a civil aiding and abetting claim, the plaintiff must show the following elements: (1) a violation of law by [the direct tortfeasor]; (2) [defendant's] knowledge of the violation; and (3) [defendant's] conscious rendering of substantial assistance to [the tortfeasor] to violate the law. *Cowing*, 499 S.W.3d at 294.

Neville argues that the complaint plausibly alleges that Southern Territory gave substantial assistance to Collier by intentionally concealing Collier's history as a sexual offender and knowingly placing him in a position of authority. [DE 38 at 524]. However, for Southern Territory's conduct to constitute aiding and abetting of Collier's human trafficking, it would have to have knowledge not just of Collier's "history" as a sexual offender, but of his conduct with respect to Neville. Neville does not allege that Southern Territory knew about any of Collier's actions involving Neville. Rather, she alleges only that Southern Territory had knowledge of Collier's past sexual offenses. She also fails to allege that Southern Territory consciously rendered substantial assistance to Collier to aid him in his violations of the law with respect to Neville. Without those allegations, the complaint fails to state a claim for aiding and abetting human trafficking. Accordingly, Count V will be dismissed as to Southern Territory.

### c.  NIED/IIED (Count VII)

Defendants argue that Neville's claim for negligent infliction of emotional distress ("NIED") and intentional infliction of emotional distress ("IIED") must be dismissed because it is a "gap-filler" claim not available when an actor's conduct amounts to the commission of another traditional tort. [DE  16-1 at 132].

Kentucky courts characterize IIED as a gap-filler tort claim, meaning it is available "only where a more traditional tort cannot provide redress for" the emotional distress. *Green v. Floyd Cnty.*, 803 F. Supp. 2d 652, 655 (E.D. Ky. 2011). Federal district courts in Kentucky "bestow NIED claims with the same 'gap-filler' status applied to IIED claims. *Oquendo v. United States*, No. 7:23-CV-40-REW-EBA, 2025 WL 2495771, at *16 (E.D. Ky. Aug. 29, 2025). Under Kentucky law, "where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and

the conduct was not intended only to cause extreme emotional distress in the victim, the tort of [NIED/IIED] will not lie." *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. Ct. App. 1993). This is because "[t]here can be only one recovery for emotional distress on the same acts." *Childers v. Geile*, 367 S.W.3d 576, 583 (Ky. 2012). However, "[t]his is not to say that [NIED/IIED] cannot be pleaded alternatively." *Id.* at 582. On the contrary, plaintiffs may plead these torts in the alternative, but plaintiffs are limited to only "one recovery on a given set of facts." *Id; see also Schuhmann*, 380 F. Supp. at 649 (allowing plaintiffs to plead IIED in the alternative and declining to dismiss that claim); *Clemons v. Couch*, No. 6:17-CV-63-HAI, 2018 WL 11463802, at *1 (E.D. Ky. Jan. 3, 2018) ("Although a plaintiff may not recover under both theories, [she] is not precluded from asserting both theories at the pleading stage." (citing *Action Capital Corp. v. Electro-Motive Diesel, Inc.*, No. 3:10-CV-434, 2011 WL 30766, at *5 (W.D. Ky. Jan. 5, 2011))).

The mere fact that Neville has alleged both traditional tort claims and an NIED/IIED claim is not grounds for dismissal at this early stage. She is free to plead both traditional torts and NIED/IIED in the alternative, but she may not *recover* for both to the extent they rely on the same set of facts. Because this is a motion to dismiss and not a motion for summary judgment, "the burden on the plaintiff is only to allege sufficient facts to show [each theory] is a plausible claim for relief." *Clemons*, 2018 WL 11463802, at *1 (alteration in original) (quoting *Holley Performance Prod., Inc. v. Keystone Auto. Operations, Inc.*, No. 1:09-CV-53-TBR, 2009 WL 3613735, at *6 (W.D. Ky. Oct. 29, 2009)). At the pleading stage, such "gap-filler" claims are allowable, and Neville has pleaded a plausible claim for relief. *See id.*

Defendants do not otherwise argue that Neville has failed to sufficiently state a claim for NIED or IIED. As a result, the Court denies Defendants motion to dismiss with respect to Count VII of the complaint.

### d. Breach of Fiduciary Duty (Count VIII)

Southern Territory argues that Neville's claim for breach of fiduciary duty must be dismissed because she has failed to allege the existence of a fiduciary relationship.[7] [DE 16-1 at 134]. Neville responds that, while the complaint does not allege a business relationship between Neville and Southern Territory, it alleges a relationship of trust that was formed by Southern Territory's provision of church services. [DE 38 at 520].

To state a claim for breach of fiduciary duty, a plaintiff must show that: "(1) the defendant owes a fiduciary duty to the plaintiff; (2) the defendant breached that fiduciary duty; and (3) the plaintiff suffered damages as a result of that breach." *Insight Ky. Partners II, L.P. v. Preferred Auto. Servs.*, Inc., 514 S.W.3d 537, 546 (Ky. Ct. App. 2016) (citing *Fastenal Co. v. Crawford*, 609 F.Supp.2d 650, 665 (E.D. Ky. Feb. 26, 2009)). A "fiduciary relationship" is defined as "one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). Such a relationship may exist "under a variety of circumstances." *Id.* (quoting *Sec. Tr. Co. v. Wilson*, 210 S.W.2d 336, 338 (1948)). While the relationship may be informal, the fiduciary must have "expressly undertaken to act for the plaintiff's primary benefit." *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 552 (Ky. 2009).

---

[7] The Defendants argue that Neville failed to allege a fiduciary relationship only with respect to Southern Territory, not K/T Division. As a result, the Court will only discuss whether the complaint states a claim for breach of fiduciary duty with respect to Southern Territory.

Accordingly, such a relationship cannot arise from the "universal business duty to deal fairly nor is it created by a unilateral decision to repose trust and confidence; it derives from the conduct or undertaking of the purported fiduciary." *Id.*

First, Neville's allegations surrounding the creation and breach of the fiduciary duty are somewhat perplexing. She alleges that Collier created the fiduciary relationship by providing counseling and mentorship to Neville, but she then alleges that Southern Territory breached its fiduciary duty by removing Collier from the registry and hiring him. [DE 1-1 ¶¶ 106, 108]. In other words, she alleges that the "breach" came before the duty was created—a legal impossibility.

To the extent that Neville alleges that the "breach" was Collier's initiation of forcible sexual contact, she has nonetheless failed to allege that Southern Territory created a fiduciary relationship with Neville prior to that breach. She alleges that a fiduciary duty between the Defendants and Neville was created when Collier solicited Neville's "trust and confidence in him as a mentor and counselor." [DE 1-1 ¶ 105]. In other words, she claims that Collier's provision of counseling and mentorship generated a fiduciary duty not just for himself but for Southern Territory. She does not allege, however, that *Southern Territory* specifically undertook to act primarily for Neville's benefit. With respect to Southern Territory, she alleges only that it hired Collier as a music director despite knowledge that he was a threat to children, and that it represented that Collier was safe to engage in counseling and mentorship with children. [*Id.* ¶¶ 19–20; 108]. These acts do not constitute an express undertaking to act primarily for Neville's benefit, so they do not create a fiduciary relationship between Southern Territory and Neville.

To the extent that Neville argues that a fiduciary relationship was created between Southern Territory—a religious institution—and Neville—a member of that institution—solely based on membership or spiritual guidance, that argument fails. Under Kentucky law, the creation of a

fiduciary relationship requires something more—the purported fiduciary must undertake to act for the plaintiff's benefit. *See Flegles*, 289 S.W.3d at 552. Under this rule, even "banks do not generally have fiduciary relationships with their debtors" because "a [borrower's] mere confidence that a bank will act fairly does not create a fiduciary relationship obligating the bank to act in the borrower's interest ahead of its own interest." *In re Sallee*, 286 F.3d 878, 893 (6th Cir. 2002). The circumstances must show that "the parties understood and agree that confidence is reposed by one party and trust accepted by the other." *Id.* Neville does not allege that Southern Territory understood and agreed to act in Neville's interest ahead of its own, or that the parties agreed that confidence was "reposed" by Neville and "accepted" by Southern Territory.

Neville points to no Kentucky case that has found a fiduciary relationship to exist with a religious or charitable organization and its members solely by virtue of the organization's provision of spiritual guidance. She cites to *O'Bryan v. Holy See*, 556 F.3d 361 (6th Cir. 2009), as support for her proposition that "[t]he Sixth Circuit has held that breach of fiduciary duty claims could properly proceed against the Catholic Church . . . based on its fiduciary relationship with parishioners . . . ." [DE 38 at 520]. However, that case considered only whether the plaintiffs' claim for breach of fiduciary duty should survive the defendant's sovereign immunity defense. *O'Bryan*, 556 F. 3d at 385–88. The court did not consider whether the plaintiff adequately alleged the elements of breach of fiduciary duty or whether a church owes a duty to is members. Accordingly, *O'Bryan* does not help Neville's position.

For these reasons, Neville has failed to allege that Southern Territory had a fiduciary duty to Neville. The facts alleged are therefore insufficient to state a claim for breach of fiduciary duty, and Count VIII will be dismissed with respect to Southern Territory.

### 4. *Leave to Amend*

Neville requests that the Court grant her leave to amend her complaint to cure any deficiencies in her pleading. [DE 38 at 525]. "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." *Newberry v. Silverman*, 789 F.3d 636, 646 (6th Cir. 2015) (quoting *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)); *see also Brown v. Matauszak*, 415 F. App'x 608, 614 (6th Cir. 2011) ("When a motion to dismiss a complaint is granted, courts typically permit the losing party leave to amend."). Because there is a reasonable probability that the complaint could be saved by amendment, the Court will dismiss the claims as outlined above without prejudice and grant Neville leave to amend.

### III.    SALVATION ARMY NATIONAL MOTION TO DISMISS

Salvation Army National argues that (1) all claims against it must be dismissed under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, [DE 20 at 175], and (2) even if the Court finds that it has jurisdiction, the claims must be dismissed under Fed. R. Civ. P. 12(b)(6) because they are time-barred and fail to state a plausible claim to relief. [*Id.* at 185, 189]. A district court may not address a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted before determining that it has personal jurisdiction over the defendant. *See Bird v. Parsons*, 289 F.3d 865, 872–73 (6th Cir. 2002) ("We must therefore decide whether personal jurisdiction exists over the [] defendants before proceeding to the merits of the case."). Accordingly, the Court will first address Salvation Army National's argument that the Court lacks personal jurisdiction.

A. <u>Personal Jurisdiction</u>

Salvation Army National moves to dismiss the complaint for lack of personal jurisdiction. In response, Neville asserts that the Court has personal jurisdiction over Salvation Army National and, in the alternative, requests that the Court grant jurisdictional discovery.

1. *Motion to Dismiss Standard*

Under Fed. R. Civ. P. 12(b)(2), the plaintiff bears the burden of establishing that personal jurisdiction is proper. *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016). "A motion to dismiss under Rule 12(b)(2) involves burden shifting: after the plaintiff makes a prima facie case for personal jurisdiction, which can be done 'merely through the complaint,' the burden shifts to the defendant." *Peters Broad. Eng'g, Inc. v. 24 Cap.*, LLC, 40 F.4th 432, 437 (6th Cir. 2022) (quoting *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 504 (6th Cir. 2020). The burden then shifts to the defendant, who must provide evidence to support the motion to dismiss. *Id.* The burden then shifts back to the plaintiff, "who may no longer stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Id.* (citation modified) (quoting *Peters Broad. Eng'g* at 437–38).  In other words, when a defendant's motion for dismissal is properly supported by affidavits, "the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

District courts may proceed through these stages in one of three ways. The Court may either: (1) rule on the motion based on the pleadings and affidavits alone; (2) hold an evidentiary hearing to resolve factual questions; or (3) permit limited discovery on the motion. *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 847 (6th Cir. 2017). The Court retains "considerable discretion" in selecting one of these three options, but "the method selected will affect the burden of proof the

plaintiff must bear to avoid dismissal." *Theunissen*, 935 F.2d at 1458; *Serras v. First Tennessee Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). Where the Court resolves a Fed. R. Civ. P. 12(b)(2) motion solely on written submissions and affidavits, the plaintiff's burden is "'relatively slight,' and "the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal.'" *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (citations omitted) (first quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988); and then quoting *Theunissen*, 935 F.2d at 1459). "Dismissal in this procedural posture is proper only if *all* the specific facts which the plaintiff . . . alleges collectively fail to state a *prima facie* case for jurisdiction." *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997) (emphasis in original) (quoting *Theunissen*, 935 F.2d at 1458). Moreover, the Court must view the pleadings and affidavits "in a light most favorable to the plaintiff" and "not 'weigh the controverting assertions of the party seeking dismissal.'" *Id.* at 549 (citing *Theunissen*, 935 F.2d at 1459). Rather, the Court may consider only "the defendant's undisputed factual assertions." *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012). In other words, while the Court "can consider defense affidavits when assessing whether the defendant has sufficiently supported their rule 12(b)(2) motion to dismiss in the second stage of the burden-shifting framework," the Court must "ignore" those affidavits "to the extent they squarely contradict the specific facts the plaintiff relies on to support their *prima facie* proofs." *Gronski v. InContact, Inc.*, 774 F. Supp. 3d 873, 880 (E.D. Mich. 2025) (quoting *Malone*, 965 F.3d at 505–06).

"When the filings suggest a disputed issue of fact, however, 'in order to resolve those issues, the district court should . . . allow[] further discovery or [hold] an evidentiary hearing.'" *Antony v. Disney Enters., Inc.*, No. 18-205-DLB-CJS, 2019 WL 5866586, at *1 (E.D. Ky. Aug.

20, 2019) (alterations in original) (quoting *Drexel Chem. Co. v. SGS Depauw & Stokoe*, 59 F.3d 170, 1995 WL 376722, at *2 (6th Cir. 1995)).

   2. *Kentucky Longarm Statute—KRS 454.210*

A federal court sitting in diversity "may exercise personal jurisdiction over an out-of-state defendant only if a court of the forum state could do so." *Blessing v. Chandrasekhar*, 988 F.3d 889, 901 (6th Cir. 2021) (citing *Kerry Steel,* 106 F.3d at 148). Until recently, Kentucky's long-arm statute "enumerated" limited bases for personal jurisdiction over out-of-state defendants. *See Blessing*, 988 F.3d at 901 (6th Cir. 2021); *see also Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 56 (Ky. 2011). Effective July 15, 2024, courts in Kentucky "may exercise personal jurisdiction over . . . a party . . . on *any basis* consistent with the Constitution of Kentucky and the Constitution of the United States." KRS § 454.210(2) (emphasis added); see also Ky. Const. § 55. Salvation Army National urges the Court to apply the prior version of KRS 454.210 "because this matter solely concerns events that took place in or before the amendment's effective date." [DE 20 at 176 n.1]. However, the Sixth Circuit addressed this specific issue and explained that courts must "apply the long-arm statute that was in effect at the time of filing . . . ." *Bell v. Kokosing Indus., Inc.*, No. 23-5791, 2024 WL 3549581, at *5 (6th Cir. July 26, 2024); *see also Woods v. Morris Mohawk Gaming Grp.*, No. 3:23-CV-00053-GFVT, 2025 WL 3459479, at *2 (E.D. Ky. Dec. 2, 2025).

   This action was filed in March 2025, long after the revisions to the longarm statute became effective. Accordingly, the Court must apply the amended version of the statute. Because the amended statute provides that a "court may exercise personal jurisdiction . . . on any basis consistent with the Constitution of Kentucky and the Constitution of the United States," KRS § 454.210(2), the Court "need only consider whether an assertion of personal jurisdiction would

comport with due process and other constitutional requirements." *Braun v. Bearman Indus.*, LLC, No. 2024-SC-0277-DG, 2025 WL 2998495, at *3 n.5 (Ky. Oct. 23, 2025); *see also Woods*, 2025 WL 3459479, at *2 ("[T]he scope of the amended Long-Arm Statute is co-extensive with the Constitutional due process analysis."); *Premier Packaging, LLC v. Sticky Fingers Sweets & Eats, Inc.*, 2025 WL 359324, at *3 (W.D. Ky. Jan. 31, 2025) ("The statute has become a due process long-arm"). "[W]hen a state's long-arm statute reaches as far as the limits of the Due Process Clause, . . . the court need only determine whether the assertion of personal jurisdiction . . . violates constitutional due process." *Aristech Chem. Int'l Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624, 627 (6th Cir. 1998) (internal quotations omitted); *see also Mayfield Consumer Prods., LLC v. Int'l Grp.*, No. 5:23-CV-00101-BJB-LLK, 2025 WL 714459, at *2 (W.D. Ky. Mar. 5, 2025) (applying the constitutional due process analysis under Kentucky's revised longarm statute). As a result, the Court will only consider whether personal jurisdiction would comport with constitutional due process requirements and not whether Salvation Army National's conduct falls within one of the nine enumerated categories in the prior version of the longarm statute.

### 3. *Federal Due Process Requirements*

For a court to constitutionally exercise personal jurisdiction over a defendant, the defendant must have "certain minimum contacts with [the forum] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457 (1940)). "Depending on the type of minimum contacts in a case, personal jurisdiction can either be specific or general." *Air Prods.*, 503 F.3d at 549–50 (citing *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1116 (6th Cir. 1994)). "A court may assert general jurisdiction" only if the defendant is "essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

Specific jurisdiction, meanwhile, depends on the defendant's "affiliation between the forum and the underlying controversy," meaning "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017) (quoting *Goodyear*, 564 U.S. at 919). Courts in the Sixth Circuit apply a three-part test to determine whether the exercise of specific personal jurisdiction would comport with constitutional due process. *Conn v. Zakharov*, 667 F.3d 705, 713 (6th Cir. 2012); *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 670 (6th Cir. 2023):

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Bird v. Parsons*, 289 F.3d 865, 874 (6th Cir. 2002); *Conn*, 667 F.3d at 713.

### 4. Analysis

Salvation Army National argues that the exercise of personal jurisdiction would not comport with constitutional due process because Neville "has not pleaded facts that would establish either general or specific jurisdiction." [DE 20 at 181]. It asserts that the Court lacks general jurisdiction because Salvation Amy National has neither its principal place of business nor its place of incorporation in Kentucky, so it is not "at home" in the forum state. [*Id.* at 181–82]. It argues that the Court also lacks specific jurisdiction because Neville has not identified any overt acts by Salvation Army National in Kentucky, and Southern Territory's actions in the state do not confer jurisdiction over Salvation Army National. [*Id.* at 183–84]. Salvation Army National provides an affidavit to support its argument. [DE 20-1]. Neville responds that the complaint alleges that "the Salvation Army [National] and its Commander have 'authority' over the Southern Territory including 'to communicate and ensure compliance with directives given by The

41

Salvation Army International.'" [DE 37 at 485]. She points to allegations in the complaint that Salvation Army National "established the territorial sex abuse registries at issue" and that Salvation Army National's Commander was responsible for overseeing the registries, but failed to enforce the policy. [*Id.*]. She provides no affidavit or declaration in support of her argument.

The parties appear to agree that Salvation Army National is not subject to general personal jurisdiction in Kentucky. Neville's complaint recognizes that "Salvation Army [National] is a foreign corporation registered with the Virginia Secretary of State," [DE 1-1 at 40], and her response to the motion to dismiss discusses only Salvation Army National's specific contacts with the forum state [DE 37 at 484–86]. Moreover, Neville does not dispute Salvation Army National's assertion that it is incorporated in New Jersey and authorized to do business in Virginia. She does not attempt to show that Salvation Army National's "affiliations with the forum state are so continuous and systematic as to render [it] essentially as home there." *Malone*, 965 F.3d at 501. Because Neville does not rely on general jurisdiction, the Court will consider only whether it has specific jurisdiction over Salvation Army National. The first question, then, is whether Neville has made a *prima facie* showing that the Court has jurisdiction; that is, whether she has established "with reasonable particularity sufficient contacts with [the defendant] and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).

The first requirement in this inquiry—purposeful availment—is "arguably the most important." *Air Prods.*, 503 F.3d at 550. Purposeful availment requires "something akin to a deliberate undertaking" and exists "when the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum state, and when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Bridgeport Music, Inc. v. Still N The*

*Water Pub.*, 327 F.3d 472, 478 (6th Cir. 2003) (citation and internal quotation marks omitted).

This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result

of random, fortuitous, or attenuated contacts" or as a result of the "unilateral activity of another

party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal

quotation marks omitted).

Neville maintains that the complaint alleges sufficient facts establishing that Salvation

Army National purposefully availed itself of the privilege of acting in the forum state, including:

> [T]he Salvation Army [National] and its Commander have "authority" over the
> Southern Territory including "to communicate and *ensure compliance* with
> directives given by The Salvation Army International." (Dkt. 1-1 ¶¶ 2, 7, emphasis
> added.) The Salvation Army [National] is made up of its four territories. (*Id*. ¶ 6.)
> The Salvation Army [National] establishes national policies, including the sexual
> abuse policy at issue here. (*Id*. ¶ 8.) The Salvation Army [National] established the
> territorial sex abuse registries at issue here, which are shared among the territories.
> (*Id*. ¶¶ 9, 13.) The Salvation Army [National] via its Commander had
> "responsibility to oversee the registries, but there is no evidence that the
> Commander was fulfilling his leadership duty in this instance." (*Id*. ¶ 15.)
> Accordingly, the "Salvation Army [National] recognized the need to protect youth
> in faith-based organizations from sexual abuse as early as 2005 when the Salvation
> Army issued its National Policy Statement on Sexual Abuse of Children," but then
> it failed to enforce that policy to prevent the sexual abuse of [Neville].

[DE 37 at 485 (emphasis in original)]. She also cites to a Salvation Army magazine article, which

states that the National Commander "coordinate[s] and supervise[s] services conducted in [the]

territories." [*Id*. at 486; DE 37-1 at 498]. In its motion to dismiss, Salvation Army National

confirms Neville's assertion that there are four Salvation Army territories in the United States and

admits that it "help[s] coordinate the activities of" those four territories. [DE 20 at 173]. However,

it contests Neville's claim that it had any supervisory role in "enforcing the applicable policy or

maintaining the territorial registries." [DE 20 at 192; *see also* DE 20-1 ¶¶ 12–14]. This constitutes

a "dispute of fact" such that the Court could opt to order discovery or an evidentiary hearing. *See*

*Serras,* 875 F.2d at 1214 ("If the written submissions raise disputed issues of fact or seem to require

determinations of credibility, the court retains the power to order an evidentiary hearing, and to order discovery . . . ." (citation omitted)). In this case, however, the Court need not order a hearing or discovery because this dispute of fact does not affect its personal jurisdiction determination. In other words, even assuming that all of Neville's allegations are true and ignoring Salvation Army National's contradictory assertions, Neville has not established a *prima facie* case for personal jurisdiction over Salvation Army National.

The crux of Neville's allegations is that Salvation Army National failed to require Southern Territory, which operated in Kentucky, to "adopt and follow the National Policy Statements on Sexual Abuse of Children, as well as the HR policy requirements that mandate background checks for employees." [DE 1-1 ¶ 66]. In other words, she argues that Salvation Army National's *failure* to act fulfills the "deliberate undertaking" requirement of purposeful availment. Neville attempts to characterize a general failure to act, which was directed nowhere in particular, as a purposeful availment of the laws of one specific state—Kentucky. She fails to allege any *overt* act by Salvation Army National that led to the removal of Collier from the registry or the rehiring of Collier by the Southern Territory. *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1274 (6th Cir. 1998) (determining that "purposeful availment" requires "some overt actions connecting the defendant with the forum state"). If Salvation Army National were subject to personal jurisdiction in Kentucky simply by way of a general failure to act, it would be subject to personal jurisdiction everywhere. Purposeful availment requires something more—that the "defendant deliberately 'reached out beyond' its home" and into the forum state. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021).

Moreover, Neville's factual allegations with respect to Salvation Army National's responsibility and failure to oversee the registries are lacking. For instance, she states that

44

"Defendant Salvation Army [National's] Commander had the responsibility to oversee the registries, but there is no evidence that the Commander was fulfilling his leadership duty in this instance." [DE 1-1 ¶ 15]. She does not state with particularity how Salvation Army National was expected to go about overseeing the registries or how it failed to satisfy its obligation to oversee the registries. She also asserts that there is "no evidence" that the Commander fulfilled his duty, but a lack of evidence that the Commander fulfilled his duty is not equivalent to affirmative evidence that he failed to fulfill his duty. These sparse allegations do not "establish[] with reasonable particularly sufficient contacts" between Salvation Army National and Kentucky to support jurisdiction. *Neogen*, 282 F.3d at 887. Accordingly, such "vague pronouncements," without more, cannot establish a *prima facie* case for personal jurisdiction. *Dean*, 134 F.3d at 1275.

The only allegation Neville makes with respect to Salvation Army National that could be considered an overt act is its alleged creation of the policies and registries that the four territories—including the Southern Territory—were expected to follow. [DE 1-1 ¶¶ 9, 13]. However, Neville fails to allege how her claims *arise out of* that overt act. To meet the second prong of the due process test, a plaintiff must show "more than mere but-for causation . . . ." *Beydoun v. Wataniya Restaurants Holding*, Q.S.C., 768 F.3d 499, 507 (6th Cir. 2014). Rather, "the plaintiff's cause of action must be proximately caused by the defendant's contacts with the forum state." *Id.* at 507–08. Here, Neville does not allege that her injuries were proximately caused by Salvation Army National's creation of the policies. She instead alleges that her injuries were caused by the removal of Collier's name from the registry, the subsequent hiring of Collier at a Salvation Army camp, and the cover up of Collier's history—all of which she alleges were carried out by the Southern Territory or K/T Division, not Salvation Army National. Without any allegation as to how the

45

mere creation of a national policy proximately caused her injury, Neville has not established that her causes of action arise from Salvation Army National's activities in Kentucky.

Finally, while Neville alleges specific acts by Southern Territory and K/T Division in Kentucky, those acts do not confer jurisdiction over Salvation Army National simply because it has authority over those entities. Generally, a parent corporation . . . is not liable for the acts of its subsidiary, even if its subsidiary is wholly owned." *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 724 (6th Cir. 2007). Under the alter ego theory of personal jurisdiction, however, "a non-resident parent corporation is amenable to suit in the forum state if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (citation omitted). "The crux of the alter-ego theory of personal jurisdiction [] is that courts are to look for two entities acting as one." *Anwar*, 876 F.3d at 848. Thus, to satisfy the alter ego test, a plaintiff must "demonstrate 'unity of interest and ownership' that goes beyond mere ownership and shared management personnel." *Id.* at 849. Under Kentucky law, a plaintiff must show two distinct elements to support an alter ego theory of personal jurisdiction: "(1) domination of the corporation resulting in a loss of corporate separateness and (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Pro Tanks Leasing v. Midwest Propane and Refined Fuels, LLC*, 988 F. Supp. 2d 772, 784–85 (W.D. Ky. Dec. 18, 2013) (quoting *Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 165 (Ky. 2012)).

Neville's allegations do not rise to this level. First, she does not even allege that Southern Territory and K/T Division are subsidiaries of Salvation Army National, so it is not clear that the alter ego theory would apply. *See Estate of Thomson*, 545 F.3d at 362 ("Normally, courts apply

the alter-ego theory of personal jurisdiction to parent-subsidiary relationships."). She merely alleges that the "Salvation Army [National] Commander had authority over Defendant Southern Territory to communicate and ensure compliance with directives given by The Salvation Army International." [DE 1-1 ¶ 2]. Even if the alter ego theory does apply in this context, however, Neville has not demonstrated that Salvation Army National "dominat[ed] . . . the corporation resulting in a loss of corporate separateness." *Inter-Tel Techs.*, 360 S.W.3d at 165. On the contrary, her allegations suggest that Southern Territory often operated independently—by making its own hiring decisions, running its own camps and programs, and "maintain[ing] a territorial registry." [DE 1-1 ¶¶ 13, 17–18]. The alter ego theory is reserved for "extraordinary cases," where a parent and subsidiary are so intertwined that "treating the parent corporation and its subsidiary" as one is justified. *Transition Healthcare Assocs., Inc. v. Tri-State Health Invs.*, LLC, 306 F. App'x 273, 280 (6th Cir. 2009) (quoting *Corrigan*, 478 F.3d at 724). Without any specific factual allegations demonstrating that Salvation Army National and Southern Territory were so intertwined that they were essentially one, this is not one of those extraordinary cases.

The Court therefore finds that it lacks personal jurisdiction over Defendant Salvation Army National. As already explained, neither jurisdictional discovery nor an evidentiary hearing is warranted because, even if the disputes of fact were resolved in Neville's favor, the allegations would not establish personal jurisdiction. While limited jurisdictional discovery is appropriate to resolve "disputed issues of fact which require resolution," the disputed issue of fact here— Salvation Army National's responsibility for overseeing implementation of the sexual abuse policy and maintaining the registries—does not "require resolution." *See Am. Greetings*, 839 F.2d at 1169 (quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977)). Because Neville has not shown, *prima facie*, that personal jurisdiction exists over Salvation Army National,

she has not met her initial burden and thus is not entitled to jurisdictional discovery. *See Drexel*, 59 F.3d 170, 1995 WL 376722, at *2 (6th Cir. 1995) ("If, in the complaint, it is unrefuted that the court has no jurisdiction, certainly no hearing or further development of the facts is necessary.").

Accordingly, the Court grants Salvation Army National's 12(b)(2) motion to dismiss for lack of personal jurisdiction. Because this Court lacks jurisdiction, it will not consider the merits of Salvation Army National's 12(b)(6) motion to dismiss.

## IV.    CONCLUSION

For the reasons set forth above, the Court **ORDERS** as follows:

(1) Southern Territory and K/T Division's motion to dismiss [DE 16] is **GRANTED** as to Counts I and II, to the extent that the claims rely on incidents that occurred after Neville turned eighteen. To the extent that the claims rely on incidents that occurred before Neville turned eighteen, the motion to dismiss is **DENIED** as to Counts I and II.

(2) Southern Territory and K/T Division's motion to dismiss is [DE 16] is **GRANTED** as to Counts III, V, and VIII with respect to Southern Territory only; and is **DENIED** as to Counts IV and VII.

(3) Salvation Army National's motion to dismiss [20] is **GRANTED** for lack of personal jurisdiction.

(4) Within **thirty (30)** days after entry of this Order, Neville **SHALL** effectuate service on Defendant K/T Division.

(5) Within thirty **(30) days** after entry of this Order, Neville **SHALL** file her amended complaint with respect to only those claims against Defendants Southern Territory and K/T Division.

Rebecca Grady Jennings, District Judge
United States District Court

March 10, 2026